No. 90-506

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

STATE OF MONTANA,

      Plaintiff and Respondent,

-vs-

MICHAEL LEE DAHMS

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fifth Judicial District,
In and for the County of Jefferson,
The Honorable Frank M. Davis, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

      Joseph R. Massman, Massman Law Firm, Helena, Montana

      For Respondent:

      Hon. Marc Racicot, Attorney General, Helena, Montana
John Paulson, Assistant Attorney General
Richard J. Llewellyn, Jefferson County Attorney,
Boulder, Montana

Submitted on Briefs:   July 16, 1991

Decided:   January 30, 1992

FILED

JAN 3 0 1992

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Justice William E. Hunt, Sr., delivered the opinion of the Court.

Defendant Michael Lee Dahms was found guilty of felony assault in violation of § 45-5-202(2), MCA, after a jury trial in the District Court for the Fifth Judicial District, Jefferson County. The District Court sentenced the defendant to a term of ten years at the Montana State Prison for felony assault and a consecutive term of ten years with five years suspended for the knowing use of a firearm during the commission of the offense pursuant to the weapon enhancement statute § 46-18-221, MCA. Defendant was designated a dangerous offender for purposes of parole eligibility and was fined the sum of $50,000. Defendant appeals. We affirm.

Defendant raises the following issues on appeal:

1. Did the District Court improperly limit defendant's cross-examination of State's witness Tom Jacobs?

2. Did the District Court err in denying defendant's motion in which defendant requested that the District Court provide for travel expenses for several potential defense witnesses from California?

3. Did the District Court properly deny defendant's motion to disqualify the County Attorney from prosecuting the case based on a conflict of interest?

4. Did defendant's conviction in State court violate Montana's double jeopardy statutes?

5. Was defendant denied his right to a speedy trial?

6. Was it error for the District Court to allow certain testimony by the State's expert witness, Connie Anders?

7. Was the sentence imposed on the defendant by the District Court excessive?

8. Did the District Court err in refusing to give defendant's proposed jury instruction D-1, and in giving the State's proposed instruction S-7?

In June 1988, Harriet Kay Plaunt and defendant met and began living together in Lyons, Michigan. In March 1989, Harriet and defendant were married while the defendant was serving time in the Ionia County Jail in Lyons. Living with Harriet at the time of this marriage were her two daughters from a previous marriage, ages 12 and 11. Upon his release from jail in May 1989, defendant decided to take Harriet and her daughters to Montana where they could find a home in the mountains and live close to nature. Accompanying the group west was Tom Jacobs, a mutual friend of both Harriet and the defendant. Harriet knew Tom from an adult education class and defendant had become acquainted with Tom while they were serving time together in a county jail in Michigan.

The Dahms party pooled their money and purchased a 1970 Buick. They loaded the car with their personal belongings, camping gear, bows and arrows, and two shotguns with ammunition, and left for Montana the first week of June 1989. The trip west was made difficult by car trouble along the way. Eventually the car broke down at the top of Homestake Pass near Butte. The group abandoned

3

the vehicle at that point and continued on to Helena when a passerby in a pickup stopped and gave the group a ride. Upon arriving in Helena, the group went to a local shelter for homeless persons. At the shelter, they received assistance and were directed to a Helena hotel at which they could stay for several days.

At the hotel, the members of the Dahms party met another couple from Michigan who told them about the Nellie Grant Mine, an old abandoned gold mine located about ten miles south of Helena near Park Lake in Jefferson County. On June 14, 1989, with the help of a friend with a pickup truck, the group travelled up into the mountains to set up camp at the Nellie Grant Mine. The group found one of the old mine buildings and rigged up some bunking spaces.

Life at the mine was not exactly what the group had expected. As the group gathered around the campfire at night, there was speculation that a wild lynx or other predatory animal was in the area of the encampment, and so shots would periodically be fired into the darkness to scare away any unwanted intruders. By day the situation was no better. Harriet, in particular, grew weary of the conditions and the whole outdoor experience. Tempers flared and arguments ensued at different times. About four days after arriving at the mine, Harriet decided to take her daughters and hike back to Helena.

At this point, there was conflicting testimony offered at trial as to what transpired next. Harriet testified that as she and her 11-year-old daughter were preparing to leave defendant began firing shots from one of the shotguns into the ground at their feet. Defendant then struck the daughter, knocking her to the ground. Harriet then began striking defendant. She alleges defendant then pointed the shotgun directly at her face and said that if she moved, she was dead. Defendant pulled back the hammer, put his finger on the trigger, and told her to go ahead and say something so that he could kill her. Harriet's daughters and Tom Jacobs were finally able to talk the defendant into putting down the shotgun. Harriet's version of events is supported by the testimony of both her 12-year-old daughter and Tom Jacobs. Defendant admits that an argument took place and that heated words were exchanged while he was holding the shotgun. However, defendant contends he did not threaten to kill Harriet or anyone else with the shotgun.

The following morning the group was able to catch a ride back into Helena. That night they stayed at the Lewis and Clark County Fairgrounds and the following morning defendant and Tom Jacobs hopped a freight train to California. Harriet then reported the assault to the police. A felony complaint was filed in Jefferson County and an arrest warrant was issued for defendant.

Shortly after arriving in California, Tom Jacobs telephoned his parents in Michigan and they wired him an airline ticket home.

In October 1989, defendant telephoned Harriet in Helena. Harriet informed the police of the call. She then had subsequent telephone calls from the defendant during which she encouraged him to return to Montana, ostensibly for a reconciliation. Harriet testified that she in fact had no intention of reconciling with the defendant but was merely attempting to lure defendant to Montana so that he could be arrested. Defendant returned to Montana and was arrested on October 31, 1989, the day he arrived in Helena.

On April 13, 1990, the defendant was found guilty after a jury trial of the offense of felony assault. On June 8, 1990, defendant was sentenced to ten years in prison for felony assault with an additional ten year sentence for the use of a weapon during the commission of the offense. The second sentence was to run consecutively with five years suspended. Defendant was designated a dangerous offender for purposes of parole eligibility and was fined the sum of $50,000, to be paid from any proceeds recovered by the defendant in a pending lawsuit. Defendant appeals.

I

Did the District Court improperly limit defendant's cross-examination of State's witness Tom Jacobs?

On appeal, defendant alleges that the District Court erred in not allowing greater latitude on cross-examination to impeach the credibility of the witness Jacobs. Specifically, the defendant contends the jury was not allowed to hear the subjective reason or ulterior motive Jacobs may have had for testifying.

At the time the assault occurred in Montana, Jacobs was on formal probation in Michigan for a felony offense. Owning and using a firearm and traveling to Montana without first obtaining the proper permission were violations of his probation, which subjected him to possible revocation of his probation. Defendant argued that Jacobs was testifying in order to avoid revocation of his probation. The State denied that Jacobs was to receive any favorable treatment in Michigan as a result of his testimony against the defendant.

Prior to trial, the State made a motion in limine requesting that the District Court restrict the defendant from inquiring into the criminal record of any of the State's witnesses for purposes of impeachment. The defendant objected to the motion in regard to the State's witness Jacobs. The District Court took the matter under advisement. Despite the fact that the State's motion in limine was still pending, counsel for the defense told the jury during opening argument that Jacobs was a convicted felon. The State objected and the court warned counsel not to mention the matter again until the court issued a ruling.

Shortly before Jacobs was to testify, the District Court ruled that the defendant would be allowed to ask two questions concerning the witness's probationary status and motive for testifying. On cross-examination, the defense could ask Jacobs if he was in fact on probation. If he answered in the affirmative, the defense could then ask if he had been granted or expected to receive any kind of

7

immunity or favorable treatment in exchange for his testimony. In response to these questions, the witness admitted to being on probation, but denied he was to receive any immunity or favorable treatment for his testimony. Finally, in his closing argument, counsel for the defense argued to the jury that Jacobs' motive for testifying was his fear that if he did not testify law enforcement would somehow retaliate against him.

Defendant is correct in his assertion that a cross-examiner should be given latitude in order to attempt to impeach the credibility of a witness. Rule 607, M.R.Evid., provides that, "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." Defendant wanted to attack the witness's motive for testifying. This Court has stated that:

> A witness' credibility may be attacked through cross-examination to reveal possible biases, prejudices, or ulterior motives if they relate directly to issues or personalities in the case at hand.

State v. Short (1985), 217 Mont. 62, 67, 702 P.2d 979, 982. However, in this instance the defendant wanted to impeach the witness by eliciting testimony on cross-examination concerning the witness's prior felony conviction. Rule 609, M.R.Evid., states "[f]or the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime is not admissible."

8

Defendant's right to impeach by showing an ulterior motive for testifying is therefore in conflict with the statutory prohibition against evidence of criminal history. Faced with this dilemma, the District Court allowed the defendant to ask the witness whether he was on probation and whether he expected to receive favorable treatment for his testimony. The extent of cross-examination allowed under these circumstances is within the District Court's discretion. Sloan v. State (1989), 236 Mont. 100, 104-05, 768 P.2d 1365, 1368. We hold the court was well within its exercise of discretion in restricting the cross-examination of the witness Jacobs as it did.

## II

Did the District Court err in denying defendant's motion in which defendant requested that the District Court provide for travel expenses for several potential defense witnesses from California?

Defendant filed a motion with the District Court requesting the court to authorize payment of travel expenses of several defense witnesses from California. Defendant contended these witnesses had overheard telephone conversations between the defendant and the victim. These conversations involved the victim's attempt to persuade the defendant to return to Montana from California, ostensibly for a reconciliation. Defendant alleged these witnesses were necessary to attack the credibility of the victim. The District Court reserved ruling on the motion until

additional proof of the materiality of the witnesses' testimony was presented. After receiving a memorandum in support of the motion and letters from the potential witnesses setting out what their testimony would be, the District Court denied the defendant's motion on the grounds that the testimony these witnesses would offer was not material. The District Court specifically noted that cost was not a factor in denying the motion.

Section 46-15-104, MCA (1989), provides that a district court may, in its discretion, provide in advance the travel expenses for witnesses appearing in criminal cases upon a subpoena. Section 46-15-113, MCA (1989), sets out the procedure for securing the attendance of a material witness in a pending prosecution. In interpreting this statute, this Court has previously held "that a trial court's finding as to the materiality of a witness when applying this particular statute will not be disturbed absent a clear showing of abuse of discretion." State v. Sanderson (1985), 214 Mont. 437, 449, 692 P.2d 479, 486. In Sanderson, we upheld a trial court's denial of a defendant's motion to provide for the attendance of an out-of-state witness. The trial court determined that the testimony of the potential witness would duplicate testimony to be offered by another defense witness, and therefore, the out-of-state witness did not qualify as a material witness under the statute.

In this case, both the victim and the defendant testified about the content of the telephone conversations. The District

Court specifically noted that their testimony covered all the information the California witnesses could possibly have testified about. We hold that in this instance the trial judge had ample reason to conclude the testimony of the out-of-state witnesses would not be material and that it was not an abuse of discretion to deny defendant's motion.

### III

Did the District Court properly deny defendant's motion to disqualify the county attorney from prosecuting the case based on a conflict of interest?

Subsequent to defendant's arrest, but prior to trial, defendant filed a pro se civil suit against Jefferson County and several of its officers. By law, the Jefferson County Attorney was required to represent the county and its officers until the county's insurance deductible had been met, at which time the representation shifted to the insurer's retained counsel. On the first day of trial, defendant made a motion to disqualify the county attorney prosecuting the case. The trial judge pointed out to the defendant that if this motion were granted his trial would be delayed as long as six months. Despite the possible delay the defendant requested that the motion be heard. Defendant alleged that the county attorney's defense against defendant's civil suit created a conflict of interest for the prosecutor in that it created prejudice and animosity toward the defendant. The State objected to the motion. The State argued that the prosecution had

begun well before the civil suit was filed, and that the defendant's prosecution had not been handled differently because of the civil suit. The trial judge refused to disqualify the prosecutor. On appeal, defendant presents little authority in support of his position, and no evidence showing his prosecution was handled any differently because of his pending civil suit. We hold that the trial judge was well within his discretion in denying defendant's motion to disqualify the county attorney.

## IV

Did defendant's conviction in State Court violate Montana's double jeopardy statute?

Under the United States Constitution a federal prosecution does not bar a subsequent state prosecution, nor does a state prosecution bar a subsequent federal prosecution of the same person for the same offense. United States v. Wheeler (1978), 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303. However, Montana is among those states which have by statute limited the concept of dual sovereignty. Section 46-11-504, MCA (1989), provides in part that:

> When conduct constitutes an offense within the concurrent jurisdiction of this state and of the United States or another state . . . a prosecution in any such other jurisdiction is a bar to a subsequent prosecution in this state under the following circumstances:
>
> (1) The first prosecution resulted in an acquittal or in a conviction as defined in 46-11-503 and the subsequent prosecution is based on an offense arising out of the same transaction.

12

The double jeopardy argument was not raised by the defendant prior to or during trial. The argument was first raised moments before the District Court sentenced the defendant. Prior to sentencing, counsel for both the State and the defendant made their recommendations on sentencing to the District Court. During defense counsel's recommendation he argued that:

> [I]f the Court were to impose enhanced sentencing because of the inclusion of a firearm that it would involve double jeopardy for a case that the Defendant has already been processed on as far as his possession of this firearm in the federal system.

The double jeopardy argument was not presented in the form of a written motion nor was any citation to authority submitted. Immediately following the recommendations of counsel, the District Court sentenced the defendant to ten years for felony assault, with an additional ten years with five suspended for the use of a weapon during the commission of the offense.

The general rule is that this Court will not entertain on appeal issues not raised at trial. State v. Wiman (1989), 236 Mont. 180, 187, 769 P.2d 1200, 1204. Section 46-20-104, MCA (1989), provides that subject to the exceptions in § 46-20-701(2), MCA (1989), none of which apply in this case, failure to make a timely objection during trial constitutes a waiver of the objection. In addition, § 46-13-102, MCA (1989), provides in part that "[d]efenses and objections based on defects in the institution of the prosecution . . ." must be raised prior to trial by way of a motion to dismiss or they are waived.

13

Additionally, the record before this Court concerning defendant's double jeopardy allegation is entirely insufficient to allow for review, even if the argument had been raised in a timely fashion below. There was absolutely no evidence presented before, during, or after trial concerning the facts and circumstances of defendant's federal prosecution. It is impossible to determine from the record if both prosecutions arose out of the same transaction or out of different transactions altogether. Concerning the timing of the two prosecutions, the record is only slightly more enlightening. While not entirely clear, it appears that the state prosecution was begun prior to the federal prosecution and that the defendant was convicted in state court prior to going to trial in federal court. If in fact this chronology is correct, then defendant's conviction did not violate Montana's double jeopardy statute. In any event, we hold that defendant's double jeopardy argument must fail in that it was not raised in a timely fashion at trial and because the record presented to this Court for review is insufficient to establish a double jeopardy defense.

## V

Was defendant denied his right to a speedy trial?

Defendant was arrested on October 31, 1989, and his trial began on April 11, 1990. The total unallocated delay between defendant's arrest and trial was 161 days. Defendant contends this delay violated his right to a speedy trial guaranteed by the Sixth

Amendment to the United States Constitution and Article II, § 24, of the Montana Constitution.

When analyzing alleged violations of a defendant's Sixth Amendment right to speedy trial, this Court has adopted the four factor balancing test set out in Barker v. Wingo (1972), 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 117. State v. Curtis (1990), 241 Mont. 288, 787 P.2d 306. The four factors to be considered are: (1) the length of the delay; (2) the reason for the delay; (3) the assertion of the right by the defendant; and (4) the prejudice to the defense. Barker, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117.

The first element, the length of the delay, is of primary importance in this analysis. Unless the length of the delay is determined to be presumptively prejudicial the analysis ends. Only a finding that the length of delay is prejudicial will trigger an analysis of the remaining three factors. Curtis, 787 P.2d at 313. This initial determination concerning the length of the delay is made by reviewing the entire delay without allocating the delay attributable to either party. Curtis, 787 P.2d at 313. We have also stated that "[w]hat length will be considered presumptively prejudicial depends on the facts of each individual case." State v. Heffernan (Mont. 1991), 809 P.2d 566, 568, 48 St.Rep. 327.

In State v. Wombolt (1988), 231 Mont. 400, 753 P.2d 330, we found that a 214 day delay was sufficient to trigger a full speedy trial analysis. In Wombolt, we set out a number of recent

15

decisions indicating that delays over 200 days will usually trigger the full analysis. However, we have held that a delay as short as 175 days was presumptively prejudicial. State v. Bartnes (1988), 234 Mont. 522, 764 P.2d 1271. In this instance, we hold that a delay of 161 days is insufficient to require further analysis of the issue by the Court.

## VI

Was it error for the District Court to allow certain testimony by the State's expert witness, Connie Anders?

The State called Connie Anders, a domestic abuse specialist, to testify as an expert witness. Defendant's objection that Anders was not qualified as an expert was overruled by the District Court. It is well settled that the question of whether a witness is qualified as an expert is largely within the discretion of the trial court and that the trial court's decision will not be disturbed unless it is shown to have been an abuse of discretion. State v. Eiler (1988), 234 Mont. 38, 52, 762 P.2d 210, 218-19.

Defendant alleges that the witness Anders was allowed to testify concerning the credibility of the victim, contrary to this Court's decision in State v. Harris (1991), 247 Mont. 405, 808 P.2d 453. Defendant is correct that testimony by Anders concerning the credibility of the victim would be improper under our holding in Harris. However, a careful study of the record of the testimony given by Anders reveals that at no time did she offer testimony on the credibility of the victim. We hold that it was not error to

16

allow the testimony of Anders and that the District Court did not abuse its discretion by recognizing the State's witness Anders as an expert in the area of domestic abuse.

## VII

Was the sentence imposed on the defendant by the District Court excessive?

Defendant was sentenced to a term of ten years at the Montana State Prison for felony assault pursuant to § 45-5-202(2), MCA, and a consecutive term of ten years, with five years suspended, for the knowing use of a firearm during the commission of the offense, pursuant to the weapon enhancement statute § 46-18-221, MCA. Defendant was designated a dangerous offender for purposes of parole eligibility and was fined the sum of $50,000, with such fine to paid out of any proceeds recovered by the Defendant in a civil lawsuit which was pending at the time of sentencing. Defendant alleges that the sentence is excessive in light of the nature of the offense and the defendant's past record.

The general rule regarding sentencing is that a sentence within the maximum statutory guidelines does not violate the Eighth Amendment prohibition against cruel and unusual punishment. State v. Watson (1984), 211 Mont. 401, 420-21, 686 P.2d 879, 889. Defendant's sentence is within the statutory guidelines set out in § 45-5-202(2), MCA, and § 46-18-221, MCA. Defendant states that he has directed a challenge of his sentence to the Sentence Review Division. This is the proper procedure to challenge the

equitability of a sentence as opposed to its legality. Watson, 686 P.2d at 889. The well settled rule concerning sentence review is that "'we will not review a sentence on appeal for mere inequity or disparity. Such a review is to be conducted by the Sentence Review Division.'" State v. Almanza (1987), 229 Mont. 383, 386, 746 P.2d 1089, 1090-91.

We hold the sentence given the defendant did not violate the Eighth Amendment prohibition against cruel and unusual punishment.

## VIII

Did the District Court err in refusing to give defendant's proposed jury instruction D-1, and in giving the State's proposed instruction S-7?

Defendant objected to the District Court's refusal to give his proposed instruction D-1 which defined the term "imminent." The State correctly argued that the term "imminent" does not refer to any element of felony assault, but applies to the justifiable use of force, which was never an issue in this case. Defendant also objected to the State's proposed instruction S-7, which referred to the concept of "reasonable apprehension" which is relevant to the crime of felony assault. The District Court correctly allowed the instruction, finding it accurately reflected the law at the time. In reviewing instructions, this Court has previously stated that "[t]he instructions must be viewed as a whole to determine whether the defendant was limited in fairly presenting his theory." Short, 702 P.2d at 984. We hold that the instructions given in this case

18

accurately reflected the law at the time and provided defendant the opportunity to present his theory to the jury.

Affirmed.

_____
Justice

We concur:

_____

_____

_____

_____
Justices

19